**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 23-54 |
| DONALD TYREE SMITH, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

## I. INTRODUCTION

Presently before the Court is Defendant Donald Tyree Smith's Motion to Suppress ("Motion to Suppress"), (Docket No. 98), in which Defendant seeks to suppress: (1) firearm evidence recovered from a search of his vehicle, and (2) all evidence recovered from a residence search. Also before the Court at this juncture are: the Supplement to Defendant's Motion to Suppress – Motion for *Franks* Hearing, (Docket No. 109), which is relevant to Defendant's request to suppress evidence obtained from the residence search; and Defendant's Motion to Suppress Evidence – Violation of Municipal Police Jurisdiction Act, (Docket No. 110), which seeks suppression of all evidence derived from his arrest and thereafter. The Government opposes Defendant's motions, and has filed both an Omnibus Response to Pretrial Motions, (Docket No. 102), and a Second Omnibus Response to Defendant's Supplemental Pretrial Motions, (Docket No. 111). Defendant's Motion to Suppress, to the extent it concerns firearm evidence recovered from his vehicle, was the subject of a suppression hearing held by the Court on July 31, 2025, the official transcript of which was filed on September 2, 2025. (Docket Nos. 113, 118). At the Court's direction, the parties submitted post-hearing proposed findings of fact and conclusions of

law relative to Defendant's motion to exclude evidence from the vehicle search that was the subject of the suppression hearing. (Docket Nos. 121, 122). The Government subsequently filed a response to Defendant's proposed findings of fact and conclusions of law, (Docket No. 123), but Defendant did not file a response by the established deadline of November 17, 2025. (Docket No. 120). The Court then took the matter under advisement.

After careful consideration of the parties' submissions, the transcript of the suppression hearing, and the credible evidence of record, and for the following reasons, Defendant's motions will be denied.

## II. <u>PROCEDURAL BACKGROUND</u>

On May 7, 2024, Defendant was charged in a five-count Superseding Indictment in this case with the following: possession with intent to distribute and distribution of a quantity of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C) (Count One); possession of a firearm (machinegun) in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 924(c)(1)(B)(ii) (Count Two); possession of a machinegun, in violation of 18 U.S.C. § 922(o)(1) (Count Three); possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count Four); and possession with intent to distribute 40 grams or more of fentanyl and a quantity of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vi), and 841(b)(1)(C) (Count Five). (Docket No. 68). The conduct underlying all counts is alleged to have occurred on or about March 5, 2023. (*See id.*). Defendant subsequently was arraigned and pled not guilty to the charges. (Docket Nos. 73, 74).

Following Defendant's arraignment, he requested and was granted extensions of time to file pretrial motions. Ultimately, Defendant filed the above-referenced motions, which are opposed by the Government. (Docket Nos. 98, 102, 109, 110, 111). As stated, Defendant's Motion

to Suppress, to the extent it concerned suppression of firearm evidence recovered from a search of his vehicle, was the subject of a suppression hearing held by the Court, and supplemental briefing on that issue is complete. These matters are all now ripe for disposition.

## III. DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE

### A. Motion to Suppress Firearm Evidence Recovered from the Search of Defendant's Vehicle

#### 1. Firearm Evidence from the Vehicle Search: Facts

At issue here in Defendant's Motion to Suppress, first, is whether firearm evidence that was obtained following a search of a vehicle that Defendant was driving should be suppressed, as Defendant advocates. On March 5, 2023, Allegheny County Court of Common Pleas Judge Kelly E. Bigley issued a search warrant for Defendant's vehicle, the affidavit in support of which (the "Vehicle Affidavit") is attached as an exhibit to the Government's Omnibus Response to Pretrial Motions. (Docket No. 102-3 at 2-3). At the suppression hearing concerning firearm evidence recovered from Defendant's vehicle, the Government called three Pittsburgh Bureau of Police ("PBP") detectives, Detective John Denis ("Detective Denis"), Detective Sean Rattigan ("Detective Rattigan"), and Detective Elvis Duratovic ("Detective Duratovic"), who all testified concerning the events bearing on the matters at issue and who were subject to cross-examination concerning same. (Docket Nos. 113, 118). The Government also entered six exhibits into evidence: an arrest warrant and police criminal complaint; a police operational plan, dated March 5, 2023; the vehicle search warrant; a video clip from the body worn camera ("BWC") of Detective Rattigan, dated March 5, 2023; a still photo from the BWC of Detective Rattigan, dated March 5, 2023; and a video clip from the BWC of Detective Duratovic, dated March 5, 2023; (hereinafter, "Ex. 10," "Ex. 7," "Ex. 3," "Ex. 2," "Ex. 2A," and "Ex. 8"). (Docket No. 113-1).

It is well-settled that, at a hearing on a motion to suppress, "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (internal quotation marks and citation omitted). Thus, the Court, "as finder of fact, is free to accept or reject any or all of a witness's testimony." *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005) (citation omitted).

In this Court's estimation, based on the demeanor and testimony of Detectives Denis, Rattigan, and Duratovic in response to the questioning of the attorneys at the suppression hearing, these individuals all offered credible testimony concerning the events that unfolded on the date in question, despite the defense's efforts to impeach them.[1] *See United States v. Garcia*, 521 F. App'x 71, 73 (3d Cir. 2013) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985) (noting that the factfinder's choice between two permissible views cannot be clearly erroneous "'[w]hen findings are based on determinations regarding the credibility of witnesses . . . for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said'")).

Additionally, Detective Denis presented as an experienced law enforcement officer, given that he has been a police officer with the PBP for eight years and has been assigned to the Fugitive Apprehension Unit ("FAU"), which is a subunit within the PBP Narcotics Unit, for the past three years. (Docket No. 118 at 6). In his career as a police officer with the PBP, Detective Denis has participated in hundreds of narcotics investigations, including by working in an undercover

[1] The Court has separately reviewed the video clips from the BWCs of Detectives Rattigan and Duratovic, which were also shown during the suppression hearing in conjunction with the detectives' testimony, and the Court notes that those video clips corroborate the testimony given by Detectives Rattigan, Duratovic, and Denis. (Docket No. 113-1).

capacity, which was his role in the investigation of Defendant. (*Id.* at 6-7).

Detective Rattigan, too, presented as an experienced law enforcement officer, as he has been a police officer with the PBP for approximately 24 years. (Docket No. 118 at 17). For approximately the last 20 years, Detective Rattigan has been a detective in the Narcotics Unit and a member of the PBP SWAT team. (*Id.*). Detective Rattigan has also been involved in hundreds of narcotics investigations and arrests during that time. (*Id.* at 18).

Detective Duratovic presented as an experienced law enforcement officer as well. He has been a police officer with the PBP for more than 18 years. (Docket No. 118 at 32). Detective Duratovic has significant experience in investigating narcotics trafficking, as he was previously assigned to the DEA on a large Title III narcotics investigation, he assisted the vice unit in a plainclothes capacity, and in 2017 he joined the PBP Narcotics Unit as a detective. (*Id.*). Detective Duratovic has also participated in well over a hundred narcotics investigations. (*Id.*).

Turning to the events at issue here, in 2020 Defendant had an active warrant for his arrest issued in Westmoreland County, Pennsylvania, based on his involvement in smuggling and distributing drugs in the Westmoreland County Prison. (Docket No. 118 at 7, 33; Ex. 10). In March of 2023, the FAU initiated a fugitive investigation to attempt to locate and arrest Defendant for his active arrest warrant. (Docket No. 118 at 8, 32-33). The PBP detectives developed a potential phone number for Defendant as part of the investigation. (*Id.* at 8-9). Using that phone number, Detective Denis communicated with Defendant via FaceTime and text messages to arrange a purchase of fentanyl and K2 from Defendant. (*Id.* at 9, 14-15). Detective Denis and Defendant planned to conduct a drug deal on March 5, 2023. (*Id.* at 9).

In order to take Defendant into custody, the detectives decided to use a "buy bust" operation, whereby an undercover officer would purchase narcotics from Defendant, after which

nearby detectives (the "takedown" or arrest team) would arrest Defendant at the scene. (Docket No. 118 at 8, 33-34). On March 5, 2023, Detective Denis communicated with Defendant regarding the purchase of $300 worth of fentanyl and K2, and arranged a meeting location at 37 Cushman Street in Pittsburgh's Mount Washington neighborhood. (*Id.* at 9). After the date and location for the drug deal was confirmed, Detective Duratovic prepared an "Operational Plan," which was presented at a pre-operation briefing attended by the detectives who were participating in the buy bust. (*Id.* at 10, 18-19, 33-34; Ex. 7). In accordance with the Operational Plan, Detective Denis was assigned to act as the undercover officer and, if the buy occurred, to assist in the preparation of any "Follow On" search warrants, which the detectives anticipated needing for the vehicle that Defendant would use to travel to the drug deal, and for the residence where they believed Defendant was staying. (Docket No. 118 at 11; Ex. 7 at 4).

The Operational Plan explained that Defendant had an active warrant for drug trafficking, that his criminal history included offenses of "rob[b]ery, assault, agg assault, [and] narcotics," and that the operation involved a buy bust in which Defendant would be traveling to deliver drugs to the undercover detective. (Ex. 7 at 1-2). Detective Rattigan, who as a member of the arrest team attended the briefing and received copy of the Operational Plan, indicated that, based on his experience, it is important for detectives to know the criminal history of the target of an operation because it alerts the detectives to the risk that the individual may pose when being arrested. (Docket No. 118 at 18-20). Moreover, an operation's nature (including the type of operation involved here) can elevate that risk, since a buy bust involves an increased risk of danger due to the recognized connection between firearms and drug trafficking. (*Id.* at 19-20).

After the pre-operation briefing, Detective Denis went to the designated meeting location, and the surveillance and arrest units took up their positions in the area. (Docket No. 118 at 12, 20,

34-35). Detective Denis testified that Defendant arrived at the meeting location in a BMW sedan, at which point he contacted Detective Denis. (*Id.* at 12). Detective Denis approached Defendant's vehicle, and observed Defendant sitting in the driver's seat. (*Id.*). Detective Denis approached the driver's side window, Defendant (from his vehicle) handed Detective Denis fentanyl, Detective Denis handed Defendant the agreed upon $300, and Defendant handed Detective Denis K2 paper in a manila envelope. (*Id.*; Ex. 8 at 01:20 – 01:30). After buying the drugs from Defendant, Detective Denis gave the takedown signal to the other units. (Docket No. 118 at 12-13; Ex. 8 at 01:29 – 01:45). Detective Novakowski, who was a team leader, gave an order to the detectives to begin moving in.[2] (*Id.*).

Detective Rattigan and numerous other detectives responded to arrest Defendant. (Docket No. 118 at 23; Ex. 7 at 4; Ex. 8 at 02:05 – 02:35). Detective Rattigan testified that when police officers arrest an individual, in addition to getting the actor detained and in handcuffs, officers must also confirm the individual's identity, collect biographical information or other identifying information, and search the individual incident to arrest. (Docket No. 118 at 21). Accordingly, Detective Rattigan indicated, while completing the arrest process, investigators clear the immediate area surrounding the arrest in order to ensure their safety. (*Id.* at 21-22). Detective Rattigan testified that when arresting an individual from a vehicle, officers generally conduct a check of the vehicle to ensure that it contains no additional occupants who could harm officers while the arrest process occurs. (*Id.* at 22). During such a check, officers are looking only for people, so they do not open glove boxes, center consoles, or other areas in a vehicle that are too small to conceal a person. (*Id.* at 22-23; Ex. 2 at 01:37 – 01:40).

---

[2] Detective Novakowski has since passed away and was therefore unable to testify at the suppression hearing. (Docket No. 118 at 34-35).

Here, upon receipt of Detective Novakowski's order to begin moving in, Detective Rattigan and other detectives approached the BMW to arrest Defendant. (Docket No. 118 at 23-24; Ex. 2 at 00:37 – 00:57). Detective Rattigan was positioned facing the front of the vehicle, looking through the windshield, while other officers and detectives were positioned at other locations around the vehicle. (Ex. 2 at 01:00 – 01:30). Defendant was ordered to exit the vehicle, which he did. (Docket No. 118 at 24). Before exiting the vehicle, however, Detective Rattigan observed Defendant moving around and reaching inside the vehicle, making movements consistent with someone removing or retrieving a firearm, and Detective Rattigan said, "He is reaching." (*Id.*; Ex. 2 at 01:13 – 01:17). Defendant then exited the vehicle, closed the driver's side door, and left the vehicle's engine running. (Docket No. 118 at 26, 37; Ex. 2 at 01:15 – 01:25). Upon exiting the vehicle, Defendant was ordered to walk slowly to the rear of the vehicle, at which point he was taken into custody by detectives. (Docket No. 118 at 24; Ex. 2 at 01:00 – 01:35). The arrest took place at the hood of the car parked directly behind the Defendant's vehicle, approximately eight to ten feet away. (*Id.*).

While Defendant was being arrested, Detective Novakowski ordered the other detectives to "get a clear on the vehicle." (Ex. 2 at 01:27 – 01:32; Ex. 9 at 02:29 – 02:32). Detective Rattigan and other detectives then opened each of the vehicle's four doors and, within a few seconds, confirmed that there were no other occupants inside. (Docket No. 118 at 24-25; Ex. 2 at 01:37 – 01:41). When Detective Rattigan opened the driver's side door, he saw a firearm laying on the driver's side floorboard. (Docket No. 118 at 25, 36; Ex. 2 at 01:44 – 01:46; Ex. 2A; Ex. 8 at 03:29 – 03:40). Detective Rattigan leaned into the vehicle and looked across to the other side of the center console, to see if there was anything laying on the passenger side floorboard. (Docket No. 118 at 25; Ex. 2 at 01:48 – 01:52). Detective Rattigan alerted the other detectives to the firearm's

presence. (Ex. 2 at 01:50 – 01:55). It is unknown whether Detective Novakowski, who was not standing by the vehicle, but was instead positioned some distance away, heard Detective Rattigan's statement about the firearm, but he told the detectives that it was "just a clear, we'll get a search warrant for it." (Ex. 2 at 01:56 – 02:02; Ex. 9 at 02:59 – 03:03). Detective Rattigan then walked towards Detective Novakowski and addressed him directly, informing him of the presence of the firearm. (Ex. 2 at 02:02 – 02:07). At that point, Detective Novakowski acknowledged Detective Rattigan's comment, and called out over the radio that a firearm had been seen in plain view. (Ex. 2 at 02:05 – 02:18; Ex. 9 at 03:10 – 03:15).

Less than a minute later, Detective Rattigan asked Detective Novakowski if they should turn off Defendant's vehicle. (Ex. 2 at 2:55 – 3:00). Detective Novakowski indicated his assent, and Detective Rattigan leaned into the driver's side of the vehicle, turned it off, and closed the driver's side door. (Docket No. 118 at 27; Ex. 2 at 02:58 – 3:16; Ex. 9 at 03:57 – 04:08). Detective Rattigan explained that police officers could not leave a BMW running in the street, because it could get stolen or moved from the scene, and that the PBP would be liable for any damage caused by such a vehicle. (Docket No. 118 at 26-27). Detective Rattigan further testified that, in leaning into the car to turn it off, there was no way that he would not have seen the gun laying on the driver's side floorboard. (*Id.* at 27).

Detective Denis gave testimony that, in accordance with the Operational Plan, the detectives had planned in advance of the operation to obtain a search warrant for the vehicle in which Defendant would arrive at the drug deal. (Docket No. 118 at 11; Ex. 7 at 4). Detective Duratovic also testified that, based on his experience, there would likely be additional narcotics in the vehicle because Defendant had just sold drugs to Detective Denis from that vehicle. (Docket No. 118 at 38). Additionally, when Defendant was arrested, a cell phone was recovered from his

person. (*Id.* at 13). Detective Denis placed a test call to the phone number that he had used to communicate with Defendant in order to arrange the drug deal, and that Defendant had used to contact Detective Denis a few minutes prior to let him know that he had arrived at the meeting location. (*Id.*). The phone recovered from Defendant did not ring when the test call was made, however, which indicated that the phone that Defendant had used to set up the drug deal was still in his vehicle. (*Id.*).

Detective Duratovic and Detective Denis obtained a warrant that day to search Defendant's vehicle for items including indicia of ownership, the firearm, the cell phone, and any "narcotics to include Fentanyl and K2, items used to weigh, distribute, [and/or] package narcotics." (Ex. 3 at 1). Defendant's vehicle remained in place on Cushman Street until the search warrant for the vehicle was issued. (Docket No. 118 at 38). The police report indicates that, upon execution of the search warrant later that day, the detectives recovered from the vehicle the firearm[3] and the cell phone that Defendant had used to coordinate the drug transaction. (Docket No. 102-6 at 4).

**2. Firearm Evidence from the Vehicle Search: Discussion**

In his Motion to Suppress, Defendant argues that, after the officers at the scene of his arrest did a protective sweep of his vehicle and yelled "clear," Detective Rattigan's actions – including opening the vehicle's driver's side door, leaning into the vehicle to look across the center console to see if there was anything laying on the passenger side floorboard, and leaning into the vehicle to turn off its engine – constituted a search requiring either a search warrant (which the detectives did not yet have) or an exception to the warrant requirement under the Fourth Amendment.[4]

[3] The recovered firearm was a Glock .40 caliber pistol, equipped with a Glock "switch" and an extended magazine. (Docket No. 102-6 at 4).

[4] The parties appear to dispute the extent to which Detective Rattigan's actions constituted part of the detectives' group search to clear the vehicle of additional occupants for officer safety, which both parties refer to as a

(Docket No. 99 at 3). Defendant further asserts that no exception to the warrant requirement applies under the circumstances here. More specifically, Defendant contends that Detective Rattigan's search of the vehicle was not a search incident to arrest since Defendant was secured and not within reach of the vehicle, nor does the automobile exception render the search here lawful because the vehicle was surrounded by detectives and other vehicles. (*Id.* at 3-4). In his Motion to Suppress, Defendant seeks to exclude as evidence at trial the firearm evidence that was observed during the pre-warrant search of the vehicle, and was subsequently seized during the execution of the search warrant for the vehicle, as fruits of the allegedly illegal search. (*Id.* at 1-2).

In response, the Government contends that Defendant's Motion to Suppress should be denied for several reasons. (Docket Nos. 102 at 6-7; 121 at 10-11). Although the Court need not address all of the arguments set forth by the Government, the arguments most relevant to the Court's analysis here are that: (1) any pre-warrant search of the vehicle that was conducted here was lawful pursuant to the automobile exception to the warrant requirement; (2) the detectives were authorized to conduct a warrantless search of Defendant's vehicle as a search incident to his arrest; (3) even if the Court were to find that the initial search of the vehicle (including the clearing of the vehicle and Detective Rattigan first leaning into the vehicle) was unlawful, at that time the

---

protective sweep. While the parties do not appear to dispute that a short search clearing a vehicle of occupants may be lawful, they also dispute whether any such check of the vehicle was necessary under the circumstances presented here.

Regardless, the Court notes that, in his testimony at the suppression hearing, Detective Rattigan described his actions as exceeding a check of the vehicle for occupants. (*See* Docket No. 118 at 25 (describing leaning further into the vehicle to look "on the other side of the [center] console, passenger side floorboard, just to see if there was anything laying in the car"); *see also* Docket No. 118 at 26-27 (explaining the need to turn off the vehicle, and identifying a still image from his BWC when he leaned into the vehicle, a second time, to turn the vehicle off)). Therefore, whether or not the initial search clearing the vehicle of additional occupants was lawful as such, for purposes of ruling on Defendant's Motion to Suppress, the Court will consider Detective Rattigan's conduct as having included, to some extent, a warrantless vehicle search that exceeded a check for additional occupants.

detectives were obligated to turn off the vehicle under their community caretaking function, at which point Detective Rattigan or another investigator would have inevitably discovered the firearm; and (4) even if the pre-warrant observation of the firearm is redacted from the Vehicle Affidavit, that affidavit still provides probable cause, so the detectives obtained a valid search warrant for the vehicle; and the detectives would have sought a search warrant for the vehicle even if the firearm had not been seen during the pre-warrant search, so the firearm that was later recovered in executing the vehicle search warrant is admissible evidence pursuant to the independent source doctrine.

For the reasons that follow, the Court finds that suppression of the firearm evidence recovered from Defendant's vehicle is not required because no Fourth Amendment violation occurred here.

**a. <u>Legal Standard – Fourth Amendment</u>**

The Fourth Amendment to the United States Constitution protects citizens against unreasonable searches and seizures. *See* U.S. CONST. amend. IV. "Warrantless searches and seizures are presumptively unreasonable and are therefore prohibited under the Fourth Amendment, unless an exception applies." *United States v. Mundy*, 621 F.3d 283, 287 (3d Cir. 2010). In order to suppress evidence, the defendant has the burden of establishing that his Fourth Amendment rights were violated. *See United States v. Acosta*, 965 F.2d 1248, 1256 n.9 (3d Cir. 1992). "However, once the defendant has established a basis for his motion, *i.e.*, the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable." *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (citation omitted). The applicable burden of proof is preponderance of the evidence. *See United States v. Mastronardo*, 987 F. Supp. 2d 569, 575 (E.D. Pa. 2013) (citing *United States v. Matlock*,

415 U.S. 164, 177 n.14 (1974)).

Here, it is undisputed that the initial search of Defendant's vehicle, at the time of his arrest, was conducted without a warrant. Defendant argues that such search violated his Fourth Amendment rights, so it is the Government's burden to show, by a preponderance of the evidence, that the search was reasonable. Additionally, even if the Court were to find that the initial vehicle search was not reasonable, the Government may still show that the evidence at issue is admissible for other reasons, including by establishing, by a preponderance of the evidence, that such evidence would have inevitably been discovered by lawful means, or that the evidence was recovered in the execution of a valid search warrant that would have been sought regardless of the initial warrantless search. As set forth below, the Court finds that the Government has sustained its burden here.

**b. The Automobile Exception to the Warrant Requirement**

Among the Government's arguments in opposing Defendant's Motion to Suppress is that, at the time of Defendant's arrest, the detectives had probable cause, and thus legal justification, to conduct a warrantless search of Defendant's vehicle pursuant to the automobile exception to warrant requirement, so any entry into or search of the vehicle was lawful. Defendant argues that the automobile exception is inapplicable here because, at the time of the search, he was out of his vehicle and under the control of officers, and the BMW was surrounded by officers or other vehicles. Defendant is incorrect.

The automobile exception permits law enforcement officers to seize and search a vehicle without a warrant if "a car is readily mobile and probable cause exists to believe it contains contraband." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). Although the seizure or search of property without a warrant generally requires a showing of both probable cause and exigent

circumstances, the "ready mobility" of automobiles is a factor that has led to permitting the search of vehicles based on probable cause without the existence of exigent circumstances. *See Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999); *Labron*, 518 U.S. at 940; *see also California v. Carney*, 471 U.S. 386, 390-91 (1985) (discussing the history of the automobile exception, the "long-recognized distinction between stationary structures and vehicles," and the characteristic ready mobility of vehicles as one of the exception's principal bases, along with the lesser expectation of privacy). In *Dyson*, the United States Supreme Court reversed the state appellate court's ruling that a warrantless search of a vehicle was illegal because there was no exigency precluding the police from obtaining a warrant that required a warrantless search, despite there being "abundant probable cause" that the vehicle contained contraband. 527 U.S. at 466-67. In so holding, the Supreme Court stated that "under our established precedent, the 'automobile exception' has no separate exigency requirement," and the finding of probable cause that the car contained contraband "alone satisfies the automobile exception to the Fourth Amendment's warrant requirement." *Id.* at 467. The Supreme Court noted that, in *United States v. Ross*, 456 U.S. 798 (1982), it had previously stated that "in cases where there was probable cause to search a vehicle 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained*.'" *Id.* (quoting *Ross*, 456 U.S. at 809 (emphasis added in *Dyson*)).

Furthermore, in *United States v. Donahue*, 764 F.3d 293 (3d Cir. 2014), the Court of Appeals for the Third Circuit found that a series of warrantless searches of a defendant's vehicle were authorized under the automobile exception, including where: the vehicle was seized without a warrant, towed to a secure facility, and searched by law enforcement pursuant to an inventory policy; the vehicle was then transferred to a public parking garage, retrieved by an FBI agent and

driven to an FBI facility, and searched by the FBI; the vehicle was then subject to an x-ray scan for any other items; and agents searched bags that had been seized from the vehicle by law enforcement five days earlier at the time of the defendant's arrest. *See id.* at 297. The Third Circuit explained in *Donahue* that "probable cause does not dissipate after the automobile is immobilized because the exception does not include an exigency component." *Id.* at 300. Thus, the Third Circuit continued, "the government can search an impounded vehicle without a warrant even though it has secured the vehicle against the loss of evidence and it has the opportunity to obtain a warrant for the search." *Id.*

Turning to the question of whether probable cause to conduct a warrantless search existed here, the Court notes that, to make such a determination, a court must consider the totality of the circumstances and decide whether, in light of the facts, there was "a fair probability that contraband or evidence of a crime" would be found in the place to be searched. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The probable cause inquiry is "commonsense, practical, and nontechnical; it is based on the totality of the circumstances and is judged by the standard of reasonable and prudent men." *Donahue*, 764 F.3d at 301 (internal quotation marks and citation omitted). "'[P]robable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide' the fruits of his crime." *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (quoting *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) (additional internal quotation marks and citation omitted)). Consequently, a "court 'is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.'" *Id.* (quoting *United States v. Whitmer*, 219 F.3d 289, 296 (3d Cir. 2000)). Additionally, a defendant's criminal history is relevant for the probable cause analysis. *United States v. Byrd*, 813

F. App'x 57, 61 (3d Cir. 2020); *United States v. Folks*, 452 F. Supp. 3d 238, 252 (W.D. Pa. Apr. 6, 2020). Courts may also give "'considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found,'" when assessing whether there is probable cause to justify a search. *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000) (quoting *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996)).

Here, the Court agrees that, at the time of Defendant's arrest, when the detectives searched his vehicle without a warrant, they had probable cause to believe that the vehicle contained contraband or evidence of a crime. Specifically, the detectives knew the following information at that time: (1) Defendant had an active arrest warrant for drug trafficking from Westmoreland County; (2) Defendant had a criminal history that included robbery, assault, aggravated assault, and narcotics; (3) Defendant had been communicating with Detective Denis for several days regarding the sale to him of fentanyl and K2; (4) Defendant had just sold fentanyl and K2 to Detective Denis from the vehicle; (5) drug traffickers often possess firearms in connection with their drug dealing; (6) when drug dealers sell drugs from a vehicle, their vehicles often contain additional drugs; and (7) when detectives approached Defendant's vehicle to arrest him, Defendant's actions in reaching around inside the vehicle were consistent with those of someone removing or retrieving a firearm. Under these circumstances, it would have been reasonable for the detectives, including Detective Rattigan, to conclude that contraband or evidence of a crime would be found in Defendant's vehicle. Therefore, the detectives' search of Defendant's vehicle was permissible under the automobile exception to the warrant requirement, and did not violate his Fourth Amendment rights.

**c. <u>The Search Incident to Arrest Exception</u>**

The Government also argues that the detectives, including Detective Rattigan, were authorized to conduct a warrantless search of Defendant's vehicle as a search incident to his arrest. Although Defendant argues that the search incident to arrest exception to the warrant requirement does not apply here because he had exited the vehicle and shut its door, so the vehicle was outside of his control at the time of his arrest, the Court disagrees.

The United States Supreme Court's analysis in *Arizona v. Gant*, 556 U.S. 332 (2009), is instructive here. In that case, a vehicle search occurred after the defendant had been arrested for driving with a suspended license, was hand-cuffed and locked in a patrol car, and could not access his vehicle. *See id.* at 335. The Supreme Court noted that, at that time, Courts of Appeals had been giving different answers to the question whether a vehicle must be within an arrestee's reach to justify a vehicle search incident to arrest. *See id.* at 342. Upon consideration, the *Gant* Court held that the search incident to arrest exception set forth in *Chimel v. California*, 395 U.S. 752 (1969), and applied to vehicle searches in *New York v. Belton*, 453 U.S. 454 (1981), "authorizes police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Gant*, 556 U.S. at 335, 343. However, the *Gant* Court further held that, although it does not follow from *Chimel*, consistent with the holding in *Thornton v. United States*, 541 U.S. 615 (2004), and following the suggestion in Justice Scalia's opinion concurring in the judgment in that case, "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Gant*, 556 U.S. at 343 (quoting *Thornton*, 541 U.S. at 632 (Scalia, J., concurring in judgment)). The *Gant* Court noted that, "[i]n many cases, as when a recent occupant is arrested for a traffic

violation, there will be no reasonable basis to believe the vehicle contains relevant evidence," but in other cases, "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Id.* at 344.

Accordingly, the *Gant* Court found that there was a lack of an evidentiary basis for the vehicle search since the defendant was arrested for driving with a suspended license, "an offense for which police could not expect to find evidence in the passenger compartment of Gant's car." 556 U.S. at 344. The Court reasoned that since the police could not reasonably have believed either that the defendant could have accessed his car at the time of the search, or that evidence of the offense for which he was arrested might have been found therein, the search was unreasonable. *See id.* The *Gant* Court concluded that its holding did not undermine law enforcement's safety and evidentiary interests because police officers may conduct a vehicle search incident to a recent occupant's arrest "when [he] is within reaching distance of the vehicle *or* it is reasonable to believe the vehicle contains evidence of the offense of arrest," and "[o]ther established exceptions to the warrant requirement authorize a vehicle search under additional circumstances when safety or evidentiary concerns demand." *Id.* at 346-47 (emphasis added) (discussing other exceptions to the warrant requirement).

In this case, unlike in *Gant*, there was an evidentiary basis for the search of Defendant's vehicle at the time of his arrest. Since the defendant in *Gant* was arrested for a traffic infraction, the police officers could not have expected to find offense-related evidence in the vehicle. Here, Defendant was arrested for selling drugs, so the detectives, including Detective Rattigan, had reason to believe, or had probable cause to believe, that evidence of drug dealing (which they had

just witnessed) would be found in Defendant's vehicle.[5] Therefore, the search of Defendant's vehicle was permissible as a vehicle search incident to Defendant's arrest. Such search, which is authorized as an exception to the warrant requirement, thus did not violate Defendant's Fourth Amendment rights.

**d. <u>The Detectives' Community Caretaking Function and Inevitable Discovery of the Firearm</u>**

The Government further asserts that, even if the detectives' initial warrantless search of the vehicle (*i.e.*, the check or clearing of the vehicle of additional occupants) was not justified by an exception to the warrant requirement and was therefore unlawful, the detectives – who were obligated to turn off Defendant's running vehicle pursuant to their community caretaking function – would have, prior to obtaining the warrant, inevitably viewed the firearm laying on the driver's side floorboard when lawfully entering the vehicle to turn off its engine. If the Government can establish by a preponderance of the evidence that – despite the firearm having been observed during an unlawful search – the firearm "'ultimately or inevitably would have been discovered by lawful means,'" then, under the inevitable discovery doctrine, the deterrence rationale has so little basis that such evidence should not be suppressed. *See United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (quoting *United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir. 1998) (citing *Nix v. Williams*, 467 U.S. 431 (1984))). "The Government can meet its burden by establishing 'that the police, following routine procedures, would inevitably have uncovered the

[5] The detectives had probable cause here to believe that offense-related evidence would be found in Defendant's vehicle (as set forth, *supra*, in the context of the automobile exception), regardless of whether the "reason to believe" standard is probable cause or a lower standard. *See, e.g., United States v. Bohannon*, 824 F.3d 242, 253-54 (2d Cir. 2016) (noting a Circuit split regarding the definition of "reason to believe," "with some courts equating reason to believe to probable cause and others holding that reason to believe is a lesser standard"); *United States v. Vasquez-Algarin*, 821 F.3d 467, 480 (3d Cir. 2016) (interpreting the Supreme Court's use of "reason to believe" to mean probable cause, in the context of warrantless entries of residences to arrest fugitives); *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004) (noting that under *Terry v. Ohio*, 392 U.S. 1, 27 (1968), and other cases, officers may conduct a pat down if they have "reasonable suspicion" that a subject may be armed and dangerous).

evidence.'" *Stabile*, 633 F.3d at 245 (quoting *Vasquez De Reyes*, 149 F.3d at 195).

Courts have repeatedly found that police officers may lawfully enter vehicles to ensure the safety of the public, pursuant to the officers' community caretaking function. *See, e.g.*, *United States v. Lewis*, 869 F.3d 460, 462-63 (6th Cir. 2017) (holding that officers could enter a vehicle to check on a sleeping occupant, noting that the officers' action in doing so fits within the community caretaker exception and was not taken with any traditional law enforcement purpose such as detection, investigation, or acquisition of evidence that would make the exception inapplicable); *United States v. Rodriguez-Morales*, 929 F.2d 780, 785-86 (1st Cir. 1991) (explaining that police officers are constantly faced with dynamic situations involving cars and must interact with car and driver to promote public safety, which reality the Fourth Amendment jurisprudence has incorporated; and finding that officers, in their community caretaking function, could impound a vehicle and bring it back to their barracks, where the vehicle was parked on the shoulder of a highway, would have posed a safety threat, and "would have been easy prey for vandals"); *United States ex rel. Labelle v. LaBelle*, 517 F.2d 750, 755 (2d Cir. 1975) (where an unoccupied car was stopped on a steeply inclined icy road in the center of a traffic lane, an officer's actions in checking to see if a parking brake was on were clearly justified as part of the police community caretaking function).

Courts have also found, more specifically, that police officers may enter vehicles to turn off a running vehicle or to secure a vehicle, pursuant to their community caretaking function. *See United States v. Suggs*, Crim. No. 19-134, 2021 WL 3417493, at *11 n.10 (W.D. Pa. Aug. 5, 2021) (explaining that, although the defendant did not explicitly argue that his Fourth Amendment rights were violated when an officer entered his vehicle to turn off the engine and shut the door, it would not be a basis to suppress evidence because such action was permissible pursuant to the automobile

exception and because the officers' entry was lawful pursuant to the community caretaking exception); *United States v. Bell*, No. 01-691, 2002 WL 171742, *1, 3 (E.D. Pa. Jan. 31, 2002) (holding that, where an agent entered a vehicle to turn off the running engine and saw the butt of a handgun sticking out from under the driver's seat, the agent had lawfully entered the car, under the community caretaking function, for the purposes of protecting law enforcement officials and the public from the danger posed by the unattended vehicle and preventing theft of the defendant's car); *see also United States v. Spooner*, 83 F. App'x 626, 628 (5th Cir. 2003) (noting that an officer validly entered the defendant's vehicle pursuant to the community caretaking function to secure it and to prevent damage or theft of the defendant's property).

In this case, when Defendant exited his vehicle at the time of his arrest, he closed the vehicle's door but left the engine running. (Docket No. 118 at 26-27, 37; Ex. 2 at 01:20 – 01:25). Detectives Rattigan and Duratovic, who have a combined 42 years of experience as PBP officers, both testified that they could not have left a running vehicle on Cushman Street after they had arrested its driver and sole occupant. (Docket No. 118 at 27, 37). As the detectives explained, allowing such a vehicle to remain running would create too great a risk of the vehicle being stolen or damaged in its owner's absence, it would pose a risk to the public and to Defendant's property, and the PBP would be liable for any ensuing damages caused by the vehicle. (*Id.*). Thus, aside from the circumstances surrounding the buy bust here, even if the detectives had simply arrested Defendant for his active Westmoreland County arrest warrant, the detectives still would have had to enter Defendant's vehicle in order to turn it off, at which point they would have inevitably encountered the firearm laying on the floorboard of vehicle. (*Id.*). As the detectives testified, and as Detective Rattigan's BWC footage clearly shows, it would have been nearly impossible for Detective Rattigan or any other officer to have turned off Defendant's vehicle without seeing the

firearm where it lay. (Ex. 2 at 03:05 – 03:15; Ex. 2A; *see also* Docket No. 118 at 27 (Detective Rattigan testifying that there was no way that he would not have seen the gun when he turned off the vehicle); Docket No. 118 at 37 (Detective Duratovic testifying that there was no way that he would not see the gun if he opened the driver's door to turn the vehicle off)).

Because, when he was arrested, Defendant left his vehicle's engine running, and because the vehicle was on a residential street at the time, it was necessary for the detectives to enter the vehicle to turn it off in accordance with their community caretaking function. As the firearm remained laying on the driver's side floorboard when Defendant exited his vehicle, it would have been impossible for any of the detectives to have not seen the firearm when opening the door and leaning into the vehicle to turn it off. Therefore, even if the initial vehicle search (when the firearm was first observed) was unlawful, the detectives would have inevitably seen the firearm through lawful means when they turned off the vehicle, so under the inevitable discovery doctrine the firearm evidence should not be suppressed. *See Stabile*, 633 F.3d at 245.

**e. <u>The Independent Source Doctrine: the Firearm Was Recovered in the Execution of a Valid Search Warrant</u>**

The Government also argues that, even if the firearm was first observed during an initial unlawful entry into the vehicle, because the firearm was later seized during the execution of a valid search warrant, it is admissible evidence under the independent source doctrine. The independent source doctrine serves as an exception to the exclusionary rule that requires the suppression of evidence obtained as a result of an illegal search. *See Stabile*, 633 F.3d at 243. It is not necessary to suppress evidence that is "'initially discovered during, or as a consequence of, an unlawful search,'" but is "'later obtained independently from activities untainted by the initial illegality,'" because the independent source doctrine applies and "removes any taint" from the

search.[6] *Id.* at 242-43 (quoting *United States v. Price*, 558 F.3d 270, 281 (3d Cir. 2009)) (additional internal quotation marks and citations omitted).

Accordingly, assuming that evidence was unlawfully viewed prior to a warrant being issued, a court asks whether that illegal search is so intertwined with the eventual recovery of the evidence under a warrant that the evidence must be suppressed. *See Stabile*, 633 F.3d at 243. Specifically, a court must consider two questions: "'(1) whether a neutral justice would have issued the search warrant even if not presented with information that had been obtained during an unlawful search and (2) whether the first search . . . prompted the officers to obtain the [subsequent] search warrant.'" *Id.* (quoting *United States v. Herrold*, 962 F.2d 1131, 1144 (3d Cir. 1992)); *see Pri*ce, 558 F.3d at 282-83. "If the answers to these questions are yes and no respectively . . . then the evidence seized during the warranted search, even if already discovered in the original entry, is admissible." *Herrold*, 962 F.2d at 1144.

Here, the answer to the first question is "yes." Upon review of the Vehicle Affidavit in this case, the Court notes that it contains only one sentence based on Detective Rattigan's opening of the vehicle's door, which states, "Detectives Rattigan and Duratovic observed a black Glock (like) firearm with an extended magazine and 'automatic' switch laying on the driver's side

[6] As the Government points out, (*see* Docket No. 102 at 7-8 n.6), under the redaction method discussed in *United States v. Johnson* (which is seemingly interrelated with the independent source doctrine), "even assuming that some factual averments in [an] affidavit are tainted, they do not vitiate a warrant which is otherwise validly issued upon probable cause reflected in the affidavit." 690 F.2d 60, 63 (3d Cir. 1982); *see also United States v. Burton*, 288 F.3d 91, 103 (3d Cir. 2002) (finding that even if certain evidence was illegally obtained, "the search warrant affidavit need not be invalidated if the other evidence in the [challenged] affidavit independently would have established probable cause to search the house."). In such situations, a court excises the tainted evidence from the warrant affidavit, and if the redacted affidavit still provides probable cause to search the space, the evidence will not be suppressed. *See Johnson*, 690 F.2d at 63; *Burton*, 288 F.3d at 103; *see also United States v. Suarez-Arzon*, 664 F. App'x 180, 181 n.3 (3d Cir. 2016) (explaining that even if information in an affidavit was mistaken, the redacted affidavit still provided probable cause) (citing *Burton*, 288 F.3d at 103). The Government argues, and the Court agrees, that under either the redaction method set forth in *Johnson* (*see infra* discussion of the independent source doctrine, which includes consideration of whether the Vehicle Affidavit with references to the firearm redacted still provides probable cause to search the vehicle) or the independent source doctrine, the firearm evidence that was seized during the execution of the vehicle search warrant is not subject to suppression.

floorboard at the feet of Smith." (Ex. 3 at 3). With that sentence removed, however, the Vehicle Affidavit still includes the following information:

- Defendant had an active arrest warrant for, *inter alia*, drug trafficking;
- The detectives learned during their investigation that Defendant was in the business of selling illegal narcotics;
- On March 3, 2023, Detective Denis, who was working undercover, contacted Defendant and discussed purchasing K2 and fentanyl from him;
- On March 4, 2023, Detective Denis and Defendant again discussed Defendant selling K2 and fentanyl to Detective Denis;
- On March 5, 2023, Defendant and Detective Denis made plans for Defendant to meet Detective Denis to sell him K2 and fentanyl;
- On March 5, 2023, following the aforementioned communication, Defendant got into a BMW with a manila envelope and drove to meet Detective Denis to sell him K2 and fentanyl;
- On March 5, 2023, Defendant arrived at the meeting location in the BMW, and sold K2 and fentanyl to Detective Denis;
- Defendant dipped his left hand and shoulder towards the door of the vehicle when officers moved in to arrest him after the drug deal was completed;
- When Defendant was taken into custody, he did not have on his person the cell phone that he had used to communicate with Detective Denis;
- A detective observed a cell phone in the center console of the vehicle during Defendant's arrest; and
- Defendant had a criminal history that included a prior drug trafficking conviction.

(Ex. 3 at 2-3).

To reiterate, probable cause exists when, viewing the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Even with Detective Rattigan's observation of the firearm redacted, the

remaining information in the Vehicle Affidavit, listed above, still established a "fair probability" that contraband or evidence of criminal activity would be found within the vehicle. *Id.* Because the Vehicle Affidavit with the observation of the firearm excised still provided probable cause to search the vehicle, a neutral justice would have issued the search warrant even if not presented with information that had been obtained during an unlawful search. *See Stabile*, 633 F.3d at 243. Therefore, the first prong of the independent source doctrine is satisfied.

Furthermore, the answer to the second question here is "no." The evidence adduced at the hearing shows that the detectives would have sought a search warrant for Defendant's vehicle regardless of Detective Rattigan's observation of the firearm inside. The Operational Plan, which was drafted and distributed prior to the buy bust operation, indicated that Detective Denis would handle any follow-up search warrant. (Ex. 7 at 4). Detective Denis testified that the detectives were planning to obtain warrants for the vehicle in which Defendant arrived, as well as for the residence where the detectives believed he was staying. (Docket No. 118 at 11). Detective Duratovic also testified that, even if the firearm had not been observed, he would have applied for a search warrant for the vehicle because Defendant had just sold drugs from the vehicle, and Detective Duratovic believed that there were more narcotics inside the vehicle. (*Id.* at 38). Additionally, Detective Denis and Detective Duratovic both believed that the vehicle contained the cell phone that Defendant had used to arrange the drug deal with Detective Denis, because they knew that Defendant had that phone with him when he arrived at the scene for the drug deal, but he did not have that phone on him when he was taken into custody. (*Id.* at 13, 39).

Therefore, the evidence establishes that the decision to seek a search warrant for Defendant's vehicle was made irrespective of Detective Rattigan's initial observation of the firearm inside the vehicle, and was not made as a result of that observation. Accordingly, on the

basis of the independent source doctrine, the firearm evidence, which was seized in the execution of a valid warrant, should not be suppressed.

**B. Motion to Suppress: Evidence Recovered from the Residence**

Also at issue in Defendant's Motion to Suppress is whether the evidence obtained following a residence search should be suppressed. On March 5, 2023, Judge Bigley authorized a warrant to search a residence associated with Defendant at 2701 Miles Avenue, Apartment 2, Pittsburgh, Pennsylvania 15216 (the "Subject Residence), for firearms, firearm components and ammunition, illegal narcotics, items used to weigh, distribute, and/or package narcotics, cell phones, indicia of ownership, and U.S. currency derived from the sale of narcotics. (Docket No. 102-1 at 1). Following a search of the Subject Residence, various items were seized, including a quantity of fentanyl, several firearm magazines, a Glock backplate, additional sheets of K2 in a manila envelope, indicia for Defendant, and other items. (Docket Nos. 102 at 5; 102-6 at 4-6).

**1. Evidence from the Residence Search: Facts**

In his Motion to Suppress, Defendant argues that all evidence obtained from the search of the Subject Residence should be suppressed. The affidavit in support of the search warrant for that residence (the "Residence Affidavit"), which was prepared by Detective Denis and Sergeant Tom Madden ("Sergeant Madden") of the Dormont Police Department (collectively, the "officer affiants"), and signed by Detective Denis, is attached as an exhibit to the Government's Omnibus Response to Pretrial Motions. (Docket No. 102-1 at 2-3). Initially, the Residence Affidavit summarized Sergeant Madden's employment and training as a police officer in the Commonwealth of Pennsylvania for 22 years, including his attendance at the Municipal Police Officer Training Academy and mandatory in-service training. (*Id.* at 2). The Residence Affidavit also summarized Detective Denis's employment and experience as a police officer in the Commonwealth of

Pennsylvania and for the City of Pittsburgh since 2017, and noted his completion of numerous courses from the Pittsburgh Police Academy, the Northeast Counterdrug Training Center, and the Multijurisdictional Counterdrug Task Force Training Program. (*Id.*). Such training included Drug identification, Detecting Misleading Behaviors in Narcotics Investigations, and Open Source Intelligence. (*Id.*). According to the Residence Affidavit, Detective Denis has previously completed numerous search warrants for residences and vehicles to assist in fugitive and narcotics investigations. (*Id.*). Detective Denis has also been involved in dozens of narcotics, firearms and warrant arrests, and he has completed numerous undercover purchases of narcotics, during which he has communicated with drug dealers and physically purchased narcotics. (*Id.*). The Residence Affidavit indicates that Detective Denis and Sergeant Madden personally participated in the fugitive investigation outlined therein, and they discussed the investigation with, and/or reviewed the reports of, other law enforcement officers. (*Id.*).

As averred in the Residence Affidavit, a felony arrest warrant had been obtained in 2020 for Defendant in Westmoreland County, in which he was charged with criminal conspiracy and drug charges. (Docket No. 102-1 at 2). On March 3, 2023, members of the PBP Fugitive Apprehension Unit ("FAU") began making efforts to locate and apprehend Defendant and, in the course of the investigation, identified a phone number belonging to him. (*Id.*). Detectives were also aware that Defendant was in the business of selling illegal narcotics. (*Id.*). Therefore, Detective Denis, working in an undercover capacity, contacted Defendant via a Facetime call, and discussed purchasing K2 and fentanyl from him. (*Id.*). Defendant indicated at that time that he would be able to sell Detective Denis those substances. (*Id.*). On March 4, 2023, Detective Denis again contacted Defendant via Facetime and text messages regarding purchasing drugs, and Defendant agreed to sell Detective Denis one "page" of K2 for $100 and $200 worth of raw

fentanyl. (*Id.*).

As the Residence Affidavit explains, on March 5, 2023, Members of the FAU, PBP Narcotics and Vice, and Members of the United States' Marshals Western Pennsylvania Fugitive Task Force ("WPAFTF") were briefed on conducting an undercover purchase of narcotics from Defendant, and subsequently arresting him, in the City of Pittsburgh. (Docket No. 102-1 at 2). The FAU, Narcotics and Vice, and WPAFTF were to serve as surveillance and arrest teams, and Detective Denis was to work in an undercover capacity. (*Id.*). The Detectives planned to conduct the purchase at a predetermined location, 37 Cushman Street. (*Id.*).

According to the Residence Affidavit, after the briefing, Detective Denis made contact with Defendant via Facetime and text messages, and coordinated the previously agreed upon drug purchase. (Docket No. 102-1 at 2). Defendant agreed to meet Detective Denis at 37 Cushman Street to sell him the agreed upon K2 and fentanyl. (*Id.*). The Residence Affidavit indicates that two other detectives, Detectives Ladner and Lincoln, were positioned with a clear view of the Subject Residence, identified therein as "Smith's residence," at which point, after the call with Detective Denis, the detectives observed Defendant exit the Subject Residence. (*Id.* at 3). Defendant was holding a yellow manila envelope when he exited the Subject Residence and entered a silver BMW. (*Id.*).

The Residence Affidavit averred that, approximately ten minutes later, Defendant arrived at 37 Cushman Street in the BMW, and Detective Denis received a Facetime call from Defendant who stated that he was at the agreed upon address. (Docket No. 102-1 at 3). Detective Denis approached the vehicle's driver's side door and observed Smith in the driver's seat. (*Id.*) Detective Denis saw Defendant remove a baggie from his hoodie, Detective Denis handed Defendant the agreed upon $300 (in official funds), and Defendant handed Detective Denis the baggie containing

fentanyl. (*Id.*). Defendant asked if Detective Denis still wanted to purchase the "page," or K2, Dennis stated that he did, and Defendant handed Detective Denis the yellow manila envelope. (*Id.*). At that point, Detective Denis gave the predetermined signal that the deal was complete, and members of the arrest team moved in and took Defendant into custody. (*Id.*).

While taking Defendant into custody, according to the Residence Affidavit, detectives observed his left hand and shoulder dip towards the door, and "Detectives Rattigan and Duratovic observed a black Glock (like) firearm with an extended magazine and 'automatic' switch laying on the driver's side floorboard" where Defendant's feet had been. (Docket No. 102-1 at 3). One cell phone and the $300 in official funds were recovered from Defendant's person, but it was determined that that phone did not bear the phone number that was used in the drug buy. (*Id.*). One of the detectives, Detective Seretti, observed a second phone in the center console of the vehicle during Defendant's arrest. (*Id.*). Another detective, Detective Hodges, ran Defendant's criminal history and determined that Defendant is a person not to possess firearms based on prior convictions. (*Id.*).

The Residence Affidavit indicated that Google Maps estimated the time required to travel from the Subject Residence to 37 Cushman Street as ten (10) minutes. (Docket No. 102-1 at 3). Given the observations made by Detectives Ladner and Lincoln of Defendant leaving the Subject Residence and the time of Defendant's arrival at 37 Cushman Street, it was determined that it took Defendant approximately ten (10) minutes to travel to that location. (*Id.*). Based on that fact, as well as the detectives' observations of Defendant exiting the Subject Residence with the yellow manila envelope that he then provided to Detective Denis (which was determined to possess the K2 paper in the form of legal documents), the Residence Affidavit averred that Defendant left directly from the Subject Residence (identified again as "his residence") and went to 37 Cushman

Street in possession of the illegal narcotics. (*Id.*).

According to the Residence Affidavit, based on these facts and circumstances, probable cause existed to believe that Defendant possessed the fentanyl and K2 inside of the Subject Residence prior to conducting the deal with Detective Denis. (Docket No. 102-1 at 3). Additionally, as indicated in the Residence Affidavit, based on the training and experience of Detective Denis and Sergeant Madden, probable cause existed to believe that Defendant likely stored other narcotics he was selling, as well as other firearms, firearm components, and currency he received as payments for his narcotics sales, inside of his residence. (*Id.*).

The Residence Affidavit was submitted in support of the search warrant for the Subject Residence. (Docket No. 102-1 at 1-3). To that end, the Residence Affidavit: referred to the Subject Residence as "Smith's residence"; averred that "Smith left directly from his residence at 2701 Miles Avenue Apartment 2 to Cushman Street in possession of the illegal narcotics"; detailed the knowledge of evidence commonly associated with drug trafficking offenses; described the background of the investigation; and set forth the basis for probable cause to search the Subject Residence. (*Id.* at 2-3).

**2. <u>Evidence from the Residence Search: Discussion</u>**

As stated, Defendant contends that the search warrant for the Subject Residence was issued in the absence of probable cause because the Residence Affidavit submitted in support of the warrant does not provide sufficient information showing a nexus between the search location and criminal activity. Defendant further contends that the warrant for the Subject Residence was based on information that was so lacking in probable cause as to render official belief in its existence entirely unreasonable, and that the evidence is thus also inadmissible under the good faith exception (*i.e.*, based on the detectives having relied in good faith on Judge Bigley's decision to

issue the warrant). Therefore, Defendant seeks the suppression of all items recovered from the search of the Subject Residence.[7]

In response to Defendant's Motion to Suppress, the Government argues that the Residence Affidavit did provide a substantial basis for Judge Bigley to find that probable cause existed to search the Subject Residence. The Government also argues that, even if the Court were to find that the Residence Affidavit did not provide probable cause, the evidence that was seized from the Subject Residence should not be excluded because the detectives relied in good faith on Judge Bigley's decision to issue the warrant, and Defendant does not contend in his Motion to Suppress that the Residence Affidavit contains any false statements.

However, with his Motion to Suppress still pending, Defendant filed a Supplement to the Motion to Suppress in which he moves for a *Franks* hearing, arguing that the Residence Affidavit does contain misstatements and material omissions that render the same invalid. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). In his Supplement, Defendant also contends that the good faith exception does not apply here because, in issuing the warrant for the Subject Residence, Judge Bigley was misled by information in the Residence Affidavit that the officer affiants knew was false or would have known was false except for their reckless disregard for the truth.

[7] Defendant also indicates in his Motion to Suppress (without providing details and without providing support in his brief) that the officers who executed the search warrant for the Subject Residence did not knock and announce prior to crossing the threshold, which rendered the search defective and violative of his constitutional rights. (Docket No. 98, ¶ 16). However, a violation of the knock-and-announce rule does not require the suppression of evidence under the exclusionary rule. *See Hudson v. Michigan*, 547 U.S. 586, 599 (2006) (concluding that "the social costs of applying the exclusionary rule to knock-and-announce violations are considerable; the incentive to such violations is minimal to begin with, and the extant deterrences against them are substantial . . . . Resort to the massive remedy of suppressing evidence of guilt is unjustified."). Accordingly, the Court need not determine whether a violation of the knock-and-announce rule occurred here since "even assuming [that such a violation occurred], suppression [of the evidence seized as a result of the search of the Subject Residence] would not be appropriate." *United States v. Briggs*, 347 F. App'x 750, 753 (3d Cir. 2009) (citing *Hudson*, 547 U.S. at 586); *see also United States v. Stalling*, 275 F. App'x 147, 149 (3d Cir. 2008) (finding that, after the district court had denied the defendant's motion to suppress, the Supreme Court held in *Hudson* "that a violation of the knock-and-announce rule does not require that evidence seized in executing a search warrant must be suppressed," so the issue was meritless).

In response to Defendant's Supplement, the Government argues that the request for a *Franks* hearing should be denied because Defendant has failed to identify specifically the alleged false statements or omissions in the Residence Affidavit, and Defendant has further failed to present an offer of proof contradicting the Residence Affidavit. The Government also asserts that, even if the warrant for the Subject Residence lacked probable cause, the good faith exception would apply here.

After considering the parties' submissions and reviewing the Residence Affidavit, the Court agrees with the Government's position, as explained below.

**a. Legal Standard – *Franks* Hearing**

In *Franks*, the Supreme Court articulated the rule governing situations involving allegedly misleading search warrant affidavits, holding that a defendant has the right to an evidentiary hearing to challenge the truthfulness of statements made in an affidavit establishing probable cause, if certain requirements are met. *See Franks*, 438 U.S. at 155-56. To obtain a hearing, *Franks* requires a defendant to make a substantial preliminary showing that the affidavit contained a false statement, which was made knowingly and intentionally or with reckless disregard for the truth, and which is necessary to the finding of probable cause. *See id.* at 155–56, 171. In order to make this showing, the defendant cannot rest on conclusory allegations or a "mere desire to cross-examine." *Id.* at 171. Rather, he must specifically identify the alleged false statements or omissions in the affidavit,[8] and present an offer of proof contradicting the affidavit (including

[8] Statements or assertions contained in an affidavit of probable cause are "made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir. 2000) (quoting *United States v. Clapp*, 46 F.3d 795, 801 n. 6 (8th Cir. 1995)). Omissions from an affidavit are made with reckless disregard for the truth if an affiant withholds facts that any reasonable person would know that a judge would want to know. *Id.* at 788. A district court "may properly infer that an affiant acted with reckless disregard for the truth where his affidavit contains an averment that was without sufficient basis at the time he drafted it." *United*

materials such as affidavits or sworn or otherwise reliable statements of witnesses) or provide a satisfactory explanation of their absence. *See id.*; *see also United States v. Desu*, 23 F.4th 224, 234 (3d Cir. 2022) (citing *United States v. Yusuf*, 461 F.3d 374, 383 n. 8 (3d Cir. 2006)).

"'[The] preliminary showing [that a defendant must make] is no light burden and puts the defendant to task by requiring some offer of proof that materially false statements were recklessly or intentionally made.'" *United States v. Romeu*, 433 F. Supp. 3d 631, 645 (M.D. Pa. 2020) (quoting *United States v. Darby*, No. 1:14-cr-00123, 2015 WL 13344905, at *3 (M.D. Pa. Aug. 19, 2015)). To reiterate, "[t]o make the initial showing, a defendant must allege with specificity what was false in the affidavit, must provide proof, must allege that the affiant had a culpable state of mind, and must allege that the remaining information from the affidavit is insufficient to support a finding of probable cause." *United States v. Yokshan*, 431 F. App'x 170, 173 (3d Cir. 2011) (citing *Franks*, 438 U.S. at 171-72).

If the requirements of the substantial preliminary showing "are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Franks*, 438 U.S. at 171-72. However, if the remaining content is insufficient, the defendant is entitled to a hearing.[9] *Id.* at 172.

---

*States v. Brown*, 631 F.3d 638, 649 (3d Cir. 2011). However, when attempting to demonstrate that the affiant included a false statement in a warrant affidavit or omitted material from it, it is insufficient to prove that he acted with negligence or made an innocent mistake. *See Franks*, 438 U.S. at 171; *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006).

[9] If a *Franks* hearing is held, and the defendant proves by a preponderance of the evidence that the false statements or omissions were made knowingly and intentionally or with a reckless disregard for the truth, and, with the affidavit's false material set aside, the remaining content is insufficient to establish probable cause, then the warrant must be voided, and the fruits of the search must be excluded from the trial. *Franks*, 438 U.S. at 156; *see also United States v. Frost*, 999 F.2d 737, 743 (3d Cir. 1993).

**b. <u>Defendant Has Not Established Entitlement to a *Franks* Hearing</u>**

In light of the prevailing legal standard, Defendant is not entitled to a *Franks* hearing because he has not made the requisite substantial preliminary showing. *See Franks*, 438 U.S. at 171. Defendant has failed to make the threshold showing for the following reasons: (1) Defendant has failed to identify with specificity any alleged false statements in, or omissions from, the Residence Affidavit; and (2) even if the Court were to find that Defendant's assertions do identify specific false statements or omissions, he has failed to make an offer of proof showing that the Residence Affidavit misstated information, or that information was omitted from the Residence Affidavit, knowingly and intentionally or with reckless disregard for the truth.

Initially, Defendant has not specifically identified any alleged false statements in the Residence Affidavit, nor has he specifically identified any items that he contends were omitted from the Residence Affidavit. Rather, Defendant states as follows:

> The critical information the affiant has omitted and the subsequent material misrepresentation stem from the following:
>
> 1. Lack of indicia establishing that Defendant lived at 2701 Miles Avenue, Apartment 2, Pittsburgh, Pa.[[10]];
>
> 2. The deliberate misstatement that Defendant's last known address was 2701 Miles Avenue, Apartment 2, Pittsburgh, Pa.
>
> 3. The search warrant issued and was obtained without evidence that the Defendant lived at 2701 Miles Avenue, Pittsburgh, Pennsylvania 15216 which suggests a material misrepresentation.

(Docket No. 109 at 5 (footnote omitted)).

Considering Defendant's averments in reverse order, the third averment does not allege a

[10] Defendant also includes, in his first averment, a footnote quoting the Residence Affidavit, which states, "Note. Detectives Ladner and Lincoln were positioned with a clear view of Smith's residence at 2701 Miles Avenue, Pittsburgh PA 15216." (Docket No. 109 at 5 n.2).

specific misrepresentation or omission, and instead restates Defendant's argument from his initial Motion to Suppress. (*See* Docket No. 98, ¶ 15 (stating that the Residence Affidavit "does not set forth a nexus between Mr. Smith and [the Subject Residence] and is without probable cause"); Docket No. 99 at 7 (stating that the Residence Affidavit "does not provide any information whatsoever as to the nexus between Mr. Smith and [the Subject Residence]"). The language set forth in the second averment – that the address of the Subject Residence was "Defendant's last known address" – does not appear in the Residence Affidavit, so it does not constitute a deliberate misstatement for purposes of a *Franks* analysis. (Docket No. 102-1 at 2-3). The first averment, much like the third averment, also simply restates the original basis for Defendant's Motion to Suppress the evidence recovered from the Subject Residence – that the Residence Affidavit contained insufficient evidence linking Defendant to the search location – which is not a specific allegation of an assertion or omission made with reckless, knowing, or intentional disregard for the truth. As Defendant does not further elaborate to provide support for these averments, his listing of such averments, without more, is directly contrary to the *Franks* requirement that a defendant must specifically identify the false statements or omissions that he alleges. *See Franks*, 438 U.S. at 171; *see also Yokshan*, 431 F. App'x at 173 ("To make the initial showing, a defendant must allege with specificity what was false in the affidavit . . . ."). Defendant's motion for a *Franks* hearing fails on this basis alone.

Even if Defendant had cleared the first hurdle, he has made no offer of proof, consisting of affidavits or sworn or otherwise reliable statements of witnesses to contradict the Residence Affidavit or to support his contention that the officer affiants knowingly omitted material information or made false statements, nor has he explained the absence of these materials. *See Franks*, 438 U.S. at 171; *Desu*, 23 F.4th at 234; *Yusuf*, 461 F.3d at 383 n. 8; *United States v.*

*Rodriguez-Colon*, 827 F. App'x 188, 190 (3d Cir. 2020) (affirming denial of a motion to suppress evidence claiming that an affidavit in support of a search warrant contained material omissions where the defendant's challenge did not contain an offer of proof).

In summary, Defendant is not entitled to relief under *Franks* because: (1) he has failed to specifically identify any alleged false statements or omissions in the Residence Affidavit; and (2) even if the Court were to find that any of his averments do specifically identify false statements or omissions, Defendant has not presented an offer of proof contradicting the Residence Affidavit and showing that the officer affiants knowingly and intentionally made false statements or omitted information from the Residence Affidavit or that they acted with reckless disregard for the truth. *See United States v. Rivera*, 524 F. App'x 821, 826 (3d Cir. 2013) ("Even if the information provided by the informants was unreliable, [defendant] has offered no evidence that the detective who provided the affidavit either knew that the information was not true or recklessly disregarded its falsity."). At most, Defendant has made vague allegations of misstatements and omissions, which are insufficient to meet his burden to show that he is entitled to a hearing under *Franks*. *See Desu*, 23 F.4th at 234 (explaining that a defendant "cannot 'rest on mere conclusory allegations . . . but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses'") (quoting *Yusuf*, 461 F.3d at 383 n.8). Therefore, Defendant's motion for a *Franks* hearing will be denied.

**c. <u>The Residence Affidavit Established Probable Cause for Issuance of the Search Warrant for the Subject Residence</u>**

To the extent Defendant's Motion to Suppress also challenges the validity of the search warrant for the Subject Residence by arguing that it was issued in the absence of probable cause, Judge Bigley properly determined that the Residence Affidavit established probable cause for the

issuance the warrant. The legal standard applicable to review of a judge's[11] determination of probable cause is summarized as follows:

> "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). A trial court exercises "only a deferential review of the *initial* probable cause determination made by the magistrate." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993) (citing *Gates*, 462 U.S. at 236) (emphasis in original). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). The deference given to a magistrate's issuance of a warrant "does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions." *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011) (internal quotations omitted). Still, "'the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993) (internal quotations omitted).
>
> A magistrate's role in issuing a warrant is to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. A warrant is to be upheld on review "as long as there is a substantial basis for a fair probability that evidence will be found." *Conley*, 4 F.3d at 1205. In conducting this assessment, a reviewing court is confined "to the facts that were before the magistrate judge, i.e., the affidavit, and [the court may] not consider information from other portions of the record." *Jones*, 994 F.2d at 1055. Stated otherwise, the District Court is restricted to viewing only the information confined by the "four corners" of the affidavit before the magistrate. *United States v. Whitner*, 219 F.3d 289, 295-96 (3d Cir. 2000). "The supporting affidavit to a search warrant is to be read in its entirety and in a common sense, nontechnical manner." *Miknevich*, 638 F.3d at 182. This includes "all the circumstances set forth in the affidavit before [her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Gates*, 462 U.S. at 238. Further, "'probable cause is a fluid concept' that turns on 'the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules.'" *Miknevich*, 638 F.3d at 182 (quoting *United States v. Shields*, 458 F.3d 269, 277 (3d Cir. 2006)). Proof beyond a reasonable doubt is not required. *Id.*

[11] Here, the search warrant for the Subject Residence was issued by a Pennsylvania Court of Common Pleas judge, rather than a magistrate judge.

*United States v. Coca*, Crim. No. 14-262, 2016 WL 7013037, at *4 (W.D. Pa. Dec. 1, 2016).

As an initial matter, no evidentiary hearing is required here regarding the issuance of the search warrant for the Subject Residence. The case law makes clear that this Court's review is confined to the "four corners" of the Residence Affidavit that was before Judge Bigley, and the Court is not to consider information from other portions of the record. *Jones*, 994 F.2d at 1055.

Therefore, turning to the Residence Affidavit, the information it contains, as summarized in detail above, established more than ample probable cause to search the Subject Residence. (Docket No. 102-1 at 2-3). It bears repeating that the Residence Affidavit detailed the background of the investigation involving Defendant, including the detectives' knowledge of his past drug offenses and that he was in the business of selling drugs. (*Id.* at 2). There was an outstanding warrant for Defendant's arrest for criminal conspiracy and drug charges, and the detectives planned an operation in which Detective Denis, acting in an undercover capacity, would buy drugs from Defendant and arresting officers would take Defendant into custody. (*Id.*) Detectives surveilling the Subject Residence saw Defendant leave from that residence – identified in the Residence Affidavit as "Smith's residence" – after a call with Detective Denis in which the sale of K2 and fentanyl was arranged. (*Id.* at 2-3). Defendant appeared to drive from the Subject Residence directly to the meeting point, where Defendant completed the sale of K2 and fentanyl to Detective Denis, at which point arresting officers moved in. (*Id.* at 3). While Defendant was being taken into custody, he dipped his left hand and shoulder towards the door of his vehicle. (*Id.*). Detectives observed a firearm with an extended magazine and automatic switch laying on the driver's side floorboard where Defendant's feet had been. (*Id.*). A cell phone was recovered from Defendant's person, but it was not the phone bearing the phone number used to set up the

drug buy, and a detective had observed a second cell phone in the center console of the vehicle. (*Id.*). The Residence Affidavit indicated that, based on the surveilling officers' observations of Defendant exiting the Subject Residence in possession of a yellow manila envelope, which he later provided to Detective Denis (and which was determined to possess K2 paper in the form of legal documents), Defendant left directly from the Subject Residence (again identified as "his residence") in possession of the illegal narcotics. (*Id.*). Additionally, the Residence Affidavit indicated that, based on the officer affiants' training and experience, probable cause existed to believe that Defendant likely stored other narcotics he was selling, as well as additional firearms, firearm components, and currency he was receiving as payments for his narcotics sales, inside his residence. (*Id.*).

Based on the Residence Affidavit, Judge Bigley issued the search warrant for the Subject Residence, and upon review, this Court finds that the information contained in the "four corners" of the Residence Affidavit was sufficient for Judge Bigley to have determined that there was a fair probability that evidence of Defendant's alleged criminal activity would be found in the Subject Residence. First, it stands to reason, generally, that an individual involved in drug-trafficking activities would maintain items related to his criminal activity, and that those items would be stored at the individual's residence, which, in this case was identified as the Subject Residence. (Docket No. 102-1 at 3). Moreover, a single sale of narcotics from a residence, when combined with other information, can be sufficient to establish probable cause. *See, e.g.*, *Unites States v. Warren*, 42 F.3d 647, 652 (D.C. Cir. 1994) (explaining that "[o]ur cases consistently have recognized that police establish probable cause for a search where they corroborate a reliable informant's tip about drug activity at a residence by conducting a single controlled buy of illegal narcotics"); *United States v. Johnson*, No. 2:17-cr-00243, 2019 WL 5288015, at *7 (W.D. Pa. Oct. 18, 2019) (finding

probable cause for a warrant where a detective applied for a warrant based on: seeing a defendant walk from a target residence porch (although not seeing him come out of the residence) and hand drugs to a customer, the detective approaching and recovering drugs from the customer, showing him a photo of the defendant and the customer confirming that the defendant had sold him the drugs; along with prior observations of the defendant coming and going from the residence; and a prior complaint about the residence).

Here, to the extent Defendant suggests that there was no nexus between his alleged criminal activity and the Subject Residence, he is incorrect. The Residence Affidavit presented information showing that Defendant was a drug trafficker since he had an active arrest warrant for drug trafficking, he was in the business of selling drugs, he had a prior conviction for drug trafficking, he had just communicated with Detective Denis multiple times regarding selling him drugs, and he had just sold Detective Denis drugs. (Docket No. 102-1 at 2-3). Additionally, reading the Residence Affidavit as a whole and in a commonsense and nontechnical manner, it shows that: Defendant stayed at the residence (as the address was referred to as "Smith's residence," and as it avers that he left directly from "his residence" at that address to meet Detective Denis on the day of the drug buy); detectives "were positioned with a clear view" of the Subject Residence after the pre-operation briefing and before the sale to Detective Denis was to occur (indicating that the detectives were surveilling the Subject Residence based on prior knowledge that Defendant was staying there); and Defendant left from the Subject Residence shortly after completing the call with Detective Denis (indicating that Defendant was at the Subject Residence when the call occurred). (*Id.* at 3). The Residence Affidavit also shows that upon leaving the Subject Residence, Defendant drove directly to the meeting location with the narcotics. (*Id.*). All of this information in the Residence Affidavit provided Judge Bigley with a substantial basis upon which to conclude

that there was a "fair probability" that the Subject Residence would contain evidence of criminal activity.

Furthermore, to the extent Defendant contends that the Residence Affidavit lacked probable cause because it does not indicate how officers knew that he was staying at the Subject Residence, the Court notes that the Third Circuit's decision in *United States v. Stanford*, 75 F.4th 309 (3d Cir. 2023), is instructive here. In *Stanford*, the Third Circuit rejected a somewhat similar argument made in a related context, explaining that such argument:

> . . . is unpersuasive because though [the defendant] *could* have been staying at multiple locations, that does not mean the police lacked probable cause to search the one place they had reason to think he *was* staying. Indeed, we have already rejected the proposition that a magistrate may not infer probable cause to search a suspect's residence just because there were *other* places the suspect might hide his contraband.

*Id.* at 314 (citing *United States v. Stearn*, 597 F.3d 540, 560 (3d Cir. 2010)) (emphasis in original).[12]

Thus, it was reasonable for Judge Bigley to conclude that items related to Defendant's alleged illicit activities were stored in the Subject Residence, under the totality of the circumstances described in the Residence Affidavit. *See, e.g., Whitner*, 219 F.3d at 296 ("The issuing judge or magistrate may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense.") (internal quotation marks and citations omitted).

12 Specifically, the defendant in *United States v. Stanford* , 75 F.4th 309 (3d Cir. 2023), argued that a residence search warrant affidavit lacked probable cause, and in response to the position that the affidavit established more than a bare link between the residence at issue and his status as a suspect in a robbery, the defendant argued that law enforcement did not know how long he had been staying at the residence, and that law enforcement believed him to be staying at many locations. *See id.* at 314.

Consequently, the Court finds that Judge Bigley had a substantial basis upon which to conclude that probable cause existed for issuance of the warrant to search the Subject Residence.

#### d. Even if Probable Cause Was Lacking, the Good Faith Exception Would Apply to the Warrant

Even were the Court to conclude that the search warrant for the Subject Residence was not based on probable cause, the good faith exception to the exclusionary rule would apply in this case. The law applicable to the good faith exception can be summarized as follows:

> The Supreme Court has held that evidence derived from a warrant not supported by probable cause is still admissible when obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate judge. *United States v. Leon*, 468 U.S. 897, 926 (1984). "[T]he purpose of the exclusionary rule - to deter police misconduct - would not be furthered by suppressing evidence obtained during a search 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *United States v. Tracey*, 597 F.3d 140, 150 (3d Cir. 2010) (quoting *Leon*, 468 U.S. at 919–20).
>
> The question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 [n.23]. Indeed, "[t]he mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *United States v. Hodge*, 246 F.3d 301, 307-308 (3d Cir. 2001) (citing *Leon*, 468 U.S. at 922). The United States Court of Appeals for the Third Circuit has recognized that the good faith exception does not apply in four limited circumstances:
>
>> 1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>>
>> 2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;
>>
>> 3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
>>
>> 4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

> *Tracey*, 597 F.3d at 151 (citations omitted). These limited exceptions "involve conduct that is 'deliberate, reckless, or grossly negligent.'" *Id*. (quoting *Herring v. United States*, 555 U.S. 135 (2009)).

*United States v. Gardenhire*, Crim. No. 15-87, 2017 WL 1105733, at *15 (W.D. Pa. Mar. 24, 2017).

Here, none of the four limited circumstances are present. As already discussed, the search warrant was not issued in reliance on a deliberately or recklessly false affidavit. Further, there is nothing in the record to suggest that Judge Bigley abandoned her judicial role and failed to act in a neutral and detached manner. Likewise, any claim that the warrant was so facially deficient that it was not particularized is unsupported by the record. Finally, despite Defendant's argument to the contrary, the Residence Affidavit in support of the warrant is not so lacking in indicia of probable cause that it was entirely unreasonable for law enforcement to rely on it in conducting the search. As explained, *supra*, under the totality of the circumstances, the information contained in the Residence Affidavit established probable cause for issuance of the warrant to search the Subject Residence.

In sum, even if the warrant was deemed insufficient, the good faith exception would apply to law enforcement's search of the Subject Residence. *See United States v. Stearn*, 597 F.3d at 566 (even if the evidence in the affidavit suggesting that the defendant was a drug dealer and connecting his drug activities to a particular house did not provide probable cause to search the house, the good faith exception applied to police officers' search of the house pursuant to a warrant based on the affidavit; and the officers executing the warrant were not unreasonable in relying on the magistrate's probable cause determination). The record in this case simply does not support a finding that any one of the four limited circumstances that permit the avoidance of the good faith

exception applies here. *See Tracey*, 597 F.3d at 151. Consequently, suppression of the evidence recovered from the Subject Residence is not warranted here.

### C. <u>Motion to Suppress Evidence – Violation of the Municipal Police Jurisdiction Act</u>

In his "Motion to Suppress Evidence – Violation of the Municipal Police Jurisdiction Act," Defendant seeks the suppression of all evidence derived from his arrest and thereafter. (Docket No. 110). Specifically, Defendant argues that his arrest by the PBP Fugitive Apprehension Unit and PBP Narcotics and Vice officers ("PBP officers") was in violation of Pennsylvania law under Section 8953 of the Municipal Police Jurisdiction Act ("MPJA"). *See* 42 Pa. Cons. Stat. § 8953. Defendant contends that the PBP officers, seeking to enforce an arrest warrant that was issued in Westmoreland County, arrested him in the City of Pittsburgh in violation of his Fourth Amendment rights. Because the PBP officers did not violate the MPJA in arresting Defendant, and because, as Defendant concedes in his brief, violation of the MPJA does not result in the exclusion of evidence in federal court without a Fourth Amendment violation (which did not occur here), Defendant's Motion to Suppress based on an alleged violation of the MPJA will be denied.

The Section 8952 of the MPJA sets forth "Primary municipal police jurisdiction" under Pennsylvania law as follows:

> Any duly employed municipal police officer shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office anywhere within his primary jurisdiction as to:
>
> (1) Any offense which the officer views or otherwise has probable cause to believe was committed within his jurisdiction.
>
> (2) Any other event that occurs within his primary jurisdiction and which reasonably requires action on the part of the police in order to preserve, protect or defend persons or property or to otherwise maintain the peace and dignity of this Commonwealth.

42 Pa. Cons. Stat. § 8952.

Here, the PBP officers, who were "within [their] primary jurisdiction" in the City of Pittsburgh, watched Defendant sell drugs to an undercover detective. *Id.* The PBP officers therefore "view[ed]" Defendant commit an "offense" "within [their] jurisdiction," and also had "probable cause to believe" that an offense "was committed within [their] jurisdiction." *Id.* Under these circumstances, the PBP officers had the "power and authority to enforce the laws of this Commonwealth or otherwise perform the functions" of their office, including by arresting Defendant for the commission of that drug trafficking offense, which they did.[13] *See, e.g.*, *Commonwealth of Pa. v. Eicher*, 605 A.2d 337, 346 (Pa. Super. Ct. 1992) (in a case in which officers from several municipalities arrested appellant in a borough following a drug sale to an undercover police officer in that borough; assuming borough officers effectuated the arrest, then no violation of the MPJA occurred because the officers were employed by the borough and were performing their official duties within their primary jurisdiction; alternatively, assuming appellant was arrested by officers from another municipality, then his arrest must still be deemed proper because those officers assisted in the arrest at the specific request of the borough's police).

Although the PBP officers were within their primary jurisdiction when they arrested Defendant, Defendant cites to Section 8953(a)(1) and (a)(4) of the MPJA to support his contention that the PBP officers' conduct was unlawful. Section 8953 concerns "Statewide municipal police jurisdiction," and provides as follows:

> (a) General rule.--Any duly employed municipal police officer who is within this Commonwealth, but beyond the territorial limits of his primary jurisdiction, shall have the power and authority to enforce the laws of this Commonwealth or otherwise perform the functions of that office as if enforcing those laws or performing those functions within the territorial limits of his primary jurisdiction in the following cases:

[13] (Docket No. 118 at 23, 39).

> (1) Where the officer is acting pursuant to an order issued by a court of record or an order issued by a district magistrate whose magisterial district is located within the judicial district wherein the officer's primary jurisdiction is situated, or where the officer is otherwise acting pursuant to the requirements of the Pennsylvania Rules of Criminal Procedure, except that the service of an arrest or search warrant shall require the consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which regularly provides primary police services in the municipality wherein the warrant is to be served.
>
> . . . .
>
> (4) Where the officer has obtained the prior consent of the chief law enforcement officer, or a person authorized by him to give consent, of the organized law enforcement agency which provides primary police services to a political subdivision which is beyond that officer's primary jurisdiction to enter the other jurisdiction for the purpose of conducting official duties which arise from official matters within his primary jurisdiction.

42 Pa. Cons. Stat. § 8953.

As the PBP officers were not beyond the territorial limits of their primary jurisdiction at the time of both the drug deal and Defendant's arrest based, at least in part, on such conduct, the parameters set forth in Section 8953 are not applicable here.[14] *See, e.g.*, *Moyer v. Commonwealth of Pa., Dep't of Transp.*, 28 A.3d 943, 945-46 (Pa. Commw. Ct. 2011) (finding that MPJA Section 8953 did not apply where a municipal officer observed a traffic violation in another borough, but initiated a traffic stop and arrested the driver for DUI in his primary jurisdiction; and explaining that the officer had authority to make that arrest under Section 8952 of the MPJA, which addresses a municipal police officer's authority to arrest within his primary jurisdiction).

Additionally, even if the Court were to find that the PBP officers' arrest of Defendant did

[14] Although Defendant argues that the PBP officers were in violation of the MPJA by arresting him in Pittsburgh because he had an active warrant for his arrest in another county, such argument is irrelevant in light of the Court's ruling here that the PBP officers were within their authority in arresting Defendant based on the drug deal transacted before them, and that the PBP officers did not violate Defendant's Fourth Amendment rights in doing so.

violate the MPJA, such violation does not, by itself, constitute a violation of the Fourth Amendment, and therefore does not mandate the exclusion of evidence in federal criminal proceedings. Since, in this case, the PBP officers had probable cause to effectuate Defendant's arrest, the arrest was reasonable, regardless of whether state law was violated in making the arrest.

Decisions from courts including the United States Supreme Court, the Third Circuit, and district courts within the Third Circuit make clear that a violation of a state law such as the MPJA does not require suppression of evidence in federal criminal proceedings. In *Virginia v. Moore*, 553 U.S. 164, 166-67 (2008), police officers conducted a custodial arrest of a defendant for a driving infraction, driving on a suspended license, which led to the recovery of drugs that became the subject of criminal charges. Virginia state law does not authorize officers to execute a custodial arrest for such offense, however, and the defendant in *Moore* argued that the Fourth Amendment required that the recovered evidence be suppressed because of the officers' violation of state law. *See id.* at 167-68. The question considered by the Supreme Court was, "whether a police officer violates the Fourth Amendment by making an arrest based on probable cause but prohibited by state law." *Id.* at 166. The Supreme Court disagreed with the defendant's argument that his arrest in violation of Virginia law constituted an *ipso facto* violation of the Fourth Amendment, concluding that "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." *Id.* at 177. The *Moore* Court further noted that "the arrest rules that the officers violated were those of state law alone," and "it is not the province of the Fourth Amendment to enforce state law." *Id.* at 178. Thus, the Fourth Amendment "does not require the exclusion of evidence obtained from a constitutionally permissible arrest." *Id.*

In *United States v. Sed*, 601 F.3d 224, 226-27 (3d Cir. 2010), Pennsylvania State Police troopers were conducting an investigation into a drug trafficking organization, using an undercover trooper to buy drugs, and the troopers mistakenly stopped the defendant in Ohio when they thought they were in Pennsylvania. The defendant in *Sed* moved to suppress the drugs seized from the traffic stop, arguing that his arrest in Ohio by Pennsylvania troopers violated Ohio's Uniform Fresh Pursuit Act, and by extension also violated his Fourth Amendment rights. *See id.* at 227-28. The Third Circuit rejected the defendant's argument, stating, "In light of *Moore,* Sed is plainly wrong when he argues that his arrest in violation of Ohio law renders the conduct of the State Police unreasonable *per se* under the Fourth Amendment." *Id.* at 228. The Third Circuit went on to consider instead whether the seizure was unreasonable under the Fourth Amendment. *See id.* In *Sed*, even though the troopers executed the arrest outside of their jurisdiction, the Third Circuit found that the arrest was not unreasonable and that the district court did not err in denying the defendant's motion to suppress evidence. *See id.* at 228-29.

In *United States v. Chambers*, 597 F. App'x 707 (3d Cir. 2015), the Third Circuit rejected an argument that evidence should be suppressed due to alleged violations of the MPJA. In that case, after a shooting in Harrisburg, Harrisburg police officers obtained a search warrant from a Swatara Township magistrate judge and, during a search of a hotel room, a firearm was recovered and became the basis for federal charges against the defendant. *See id.* at 709-10. The Third Circuit rejected the defendant's argument that the police violated the MPJA by seeking the warrant from the Swatara Township judge when the shooting occurred in Harrisburg, explaining that "[e]ven if [the defendant's] interpretation of the [MPJA] were correct, however, he does not explain how a violation of state law would be relevant to the federal constitutional analysis required here." *Id.* (citing *Moore*, 553 U.S. at 176-78).

Likewise, the Pennsylvania District Courts within the Third Circuit have held that violations of the MPJA, standing alone, do not require suppression of evidence as violations of the Fourth Amendment. *See, e.g.*, *United States v. Neal*, No. 4:17-CR-00255, 2018 WL 3008488, at *3 (M.D. Pa. June 15, 2018) (explaining that the *Moore* Court wrote "that state law restrictions do not alter the Fourth Amendment's protections," that both the Third Circuit and courts within this Circuit have found that a violation of the MPJA and the Pennsylvania special detective statute "does not constitute a Fourth Amendment violation," and that even if the municipal officers "acted beyond their authority granted by either the MPJA or the special detective statue . . . such a violation would not require the suppression of the evidence seized"); *United States v. Briggs*, Crim. Action No. 06-715-01, Civ. Action No. 11-1816, 2011 WL 2681491, *4 (E.D. Pa. July 8, 2011) (holding that, even if the municipal officers' arrest of the defendant "outside their area of primary jurisdiction were a violation of state law – which it is not – such a violation would not, by itself, constitute a violation of the Fourth Amendment" (citing *Moore*, 553 U.S. 164)); *United States v. Zareck*, Crim. No. 09-168, 2010 WL 5053916, *18-19 (W.D. Pa. Dec. 3, 2010) (denying a motion to suppress based on an alleged violation of the MPJA, explaining that "[i]f Pennsylvania law was violated in the process of securing and executing a search warrant," the court was not required to find a federal constitutional violation, and noting that the Third Circuit had stated, "'We have never held that an arrest that is unlawful under state or local law is unreasonable *per se* under the Fourth Amendment.'" (quoting *United States v. Laville*, 480 F.3d 187, 192 (3d Cir. 2007)); *United States v. Johnson*, Crim. Action No. 09-501, 2010 WL 2136551, *3 (E.D. Pa. May 26, 2010) (stating that, "to the extent the Defendant argues his constitutional rights were violated if the [municipal] police had arrested him in violation of the MPJA, the Court notes that it is well-established that 'the Fourth Amendment is not implicated simply because an individual violates state law,'" and

that "[a] violation of the MPJA simply does not equal a violation of constitutional rights") (quoting *Armstead v. Township of Upper Dublin*, 347 F. Supp. 2d 188, 194 (E.D. Pa. 2004)).

In this case, after PBP officers observed Defendant sell fentanyl and K2 to an undercover detective in the City of Pittsburgh, the officers arrested Defendant, which is not unreasonable for purposes of the Fourth Amendment. Since the PBP officers effectuated a "warrantless arrest[] for crimes committed in the presence of an arresting officer," their conduct was "reasonable under the Constitution." *Moore*, 553 U.S. at 176. Furthermore, even if the Court were to find that the PBP officers did violate the MPJA, any such violation does not establish that a Fourth Amendment violation occurred here. Accordingly, Defendant's Motion to Suppress all evidence derived from his arrest and thereafter, based on the PBP officers' alleged violation of the MPJA, will be denied.

## IV. CONCLUSION

For the reasons discussed herein, Defendant's Motion to Suppress, (Docket No. 98), the Supplement to Defendant's Motion to Suppress – Motion for *Franks* Hearing, (Docket No. 109), and Defendant's Motion to Suppress Evidence – Violation of Municipal Police Jurisdiction Act, (Docket No. 110), are DENIED.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Date: December 19, 2025
cc/ecf: All counsel of record